UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.  _____

HEAL BEHAVIORAL HEALTH,
INC. and SEAN WOLF TRUST

      Plaintiffs,

v.

PALM BEACH COUNTY, FLORIDA,

      Defendant.

_____/

## COMPLAINT

Plaintiff, Heal Behavioral Health, Inc. ("Heal") and the Sean Wolf Trust (the "Trust", and together with Heal, the "Plaintiffs"), sue Defendant, Palm Beach County, Florida, (the "County" or "Defendant"), and state:

## INTRODUCTION

1.    Plaintiffs assert claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. ("ADA") and the Fair Housing Act, 42 U.S.C. § 3601 *et seq*. ("FHA"), as amended by the Fair Housing Amendments Act ("FHAA") (collectively, the "Acts").

2.    Plaintiffs challenge the County's retaliation and other discriminatory actions designed to restrict and burden a protected class of disabled residents from obtaining or remaining in housing at Plaintiffs' Ranch at 17593 Rocky Pines Road, Jupiter, Florida. (the "Ranch"), a safe, effective and necessary [home] for persons recovering from substance use disorders.

3.      The Ranch is a spacious five-acre agricultural-residential property with two large homes, including a total of eight bedrooms, six full baths, two half-baths and two kitchens.[1]  It is a dwelling within the meaning of the FHA. The combined living space is 7,522 square feet.  There is a covered breezeway between the two living spaces. Below is a photograph:



4.      In addition, the Ranch in an equestrian property including multiple out-buildings, a horse stable, and a large pool. The property is zoned agricultural residential, (AR). After preparing the homes to accommodate recovering residents, Plaintiffs submitted a request for reasonable accommodation on October 29, 2019 to the County explaining why it is reasonable and necessary

---

[1] Each living space has four bedrooms, three full baths and one half-bath. The reasonable accommodation request undercounted the bedrooms at seven; there are eight bedrooms, and undercounted the half-baths at one, there are two. That request is hereby corrected from seven bedrooms to eight bedrooms and one half-bath to two half-baths.

for more than four disabled residents per home to reside at the Ranch for recovery from substance use disorders and asking to be treated as a single family for all purposes. Exhibit 1.

5.     It is well established that individuals new in recovery need to live together with others who are abstaining from drugs and alcohol, including by sharing a bedroom. This environment limits isolation and provides continuous assistance from other residents to identify, confront and/or resolve problems and issues, before they can lead to a possible relapse.

6.     Apparently in response to intense community and political opposition to the Ranch's existence, and before Plaintiffs planned meeting with the County on November 18, the County issued an order in a November 15, 2019 letter: evict all but five of the residents of the Ranch by Monday, November 25. At the November 18, 2019 meeting, that order turned to an ultimatum: evict all but five residents or be "red-tagged" and have the electricity turned off on Monday, November 25, 2019.

7.     The purported reason for this draconian response to Plaintiffs' request for reasonable accommodation is that the Ranch is not equipped with a residential grade fire sprinkler and fire alarm monitoring system. Such a system is not required to be installed in nearby homes occupied by people related by blood, marriage or adoption, regardless of the number of family members.

8.     This draconian response constitutes retaliation, coercion, and a direct threat by the County against Plaintiffs for requesting a reasonable accommodation.

9.     As detailed below, the County definitions of "family," "dwelling" and "residential uses" are inconsistent and incompatible with the ADA and FHA.

10.     The definition of family has evolved substantially over the last 50 years. "[T]he Supreme Court consistently has expanded the scope of persons who deserve recognition as a

"family" under the law: interracial spouses; extended relatives living under one roof; and same-sex spouses. "Ours is by no means a tradition limited to respect for the bonds uniting the members of the nuclear family." *See, Oxford House, Inc. v. Browning*, 266 F. Supp. 3d 896, 915 (M.D. La. 2017) (citations omitted).

11.     In an abundance of caution and in an attempt to stave off the pending evictions, Plaintiffs expressed willingness to file a change in occupancy, and consider installing additional fire safety protections, and reduce the number of residents to 16.  Plaintiffs have since learned that the permitting process for the required sprinkler system alone takes at least three months.

12.     Nevertheless, the County has refused to remove the threat of eviction, forcing Plaintiffs to seek relief from this Court.[2]

13.     The Ranch meets the standards for residential and outpatient substance use disorder treatment set by the Florida Department of Children & Families ("DCF").  It is licensed in accordance with Chapter 397, Fla. Stat., to provide substance use disorder treatment services.  As a condition of licensure, DCF requires Heal and other licensees to provide proof that their facilities are properly zoned. Heal expects to be registered on the SAMHSA locator within the week.

14.     To ensure fire safety, the Ranch already has fire extinguishers, smoke detectors, Co2 detectors, egress windows, exits signs, fire drills on a monthly basis, annual fire inspections by licensed fire inspectors, and behavioral health technicians providing 24/7 awake supervision of the property and grounds, including fire watch, and visual check of all residents every 30 minutes

---

[2]  Plaintiffs have also filed with the County the requested "Change of Occupancy" form and agreed to reduce the number of residents to 16.  However, the County refused to remove the threat of eviction.  Plaintiffs maintain their request to be treated as a single family for all purposes and dispute the appropriateness of the sprinkler requirement.

at a minimum.  The Ranch's Life Safety Policies and Procedures includes extensive fire safety procedures.

15.     The Ranch is a safe and effective home for persons recovering from substance use disorders.  Plaintiffs challenge the County's discriminatory and pretextual requirement of an immediate (and impossible) installation of a residential grade fire sprinkler and fire alarm monitoring system.

### Jurisdiction and Venue

16.     This action is brought pursuant to the ADA, FHA and 42 U.S.C. §1983.

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337, 1343(a) and 1391(b)(2), 29 U.S.C. § 794(a), and 42 U.S.C. § 12182(a).

18.     Plaintiffs seek declaratory and injunctive relief pursuant to 42 U.S.C. § 12133, as well as Rules 57 and 65 of the Federal Rules of Civil Procedure.

19.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(1), as all acts complained of occurred within this District in Palm Beach County, Florida.

### Parties

20.     Heal Behavioral Health, Inc. is a Florida corporation.

21.     Heal provides substance use disorder treatment for its patients at 1700 Okeechobee Road, West Palm Beach, Florida and, as stated above, housing at the Ranch.

22.     Plaintiffs are a treatment and housing provider for persons with disabilities or is otherwise associated with such treatment providers or persons with disabilities.  As such,  Heal is a person "alleging discrimination on basis of disability" under the ADA, 42 U.S.C. § 12133, and 28 C.F.R. § 35.130(g), which has been injured, and continues to be injured, by the County's discriminatory conduct and has suffered damages, and continues to suffer, for lost or delayed

profits, lost opportunity, frustration of mission, diminution of market share, and a loss of civil rights as a direct result of the County's conduct.

23.     As alleged further below, Heal's current and prospective residents are considered people with disabilities under the ADA, and therefore a protected class.

24.     The Sean Wolf Trust owns the property;  Heal operates it.

25.     Plaintiffs are housing providers for persons with disabilities or is otherwise associated with such housing providers or persons with disabilities. As such, it is also an "aggrieved person" under the FHA. 42 U.S.C. § 3602(i)(2).

26.     Heal is currently licensed by DCF to provide Day/Night Treatment with Community Housing through which it provides treatment to people in recovery at its clinical facility in the City of West Palm Beach and housing at the Ranch in unincorporated Palm Beach County in a subdivision known as Jupiter Farms.

27.     No licensable treatment is provided at the Ranch.

28.     The length of treatment offsite and transitional housing at the Ranch differs from patient to patient, but typically ranges from 30 to 90 days.

29.     Defendant, Palm Beach County, is a Florida political subdivision.  The County provides zoning, building code, and fire prevention services. The County exercises enforcement and interpretive authority over zoning, fire safety and building ordinances, and otherwise provides municipal services.

30.     The County is responsible for the acts of its agents and employees and for the enforcement of its zoning, building and fire codes.  The County is a public entity under the ADA, 42 U.S.C. § 12131(1).

31.     The County's zoning code is the Palm Beach County Unified Land Development Code. ("ULDC"). *See* www. http://www.pbcgov.com/uldc/.

32.     The County's fire code is the Florida Fire Prevention Code, including the Florida editions of NFPA 1 Fire Code and NFPA 101 Life Safety Code, together with the local Palm Beach County amendments thereto, Chapter 69A-60, Florida Administrative Code.

33.     The County's building code is Florida Building Code, 6th Edition, together with the Palm Beach County Amendments thereto.

### Facts

34.     In 2019, the Sean Wolf Trust found and purchased the Ranch for patient housing.

35.     As described above, the Ranch is a spacious, estate-like property zoned Agricultural Residential (AR) which allows, as a permitted use, single family homes and agricultural or equestrian activity.

36.     On information and belief, the property has been used for years for equestrian purposes and will continue to be used as such by many of the residents.  The equestrian life and environment at the Ranch provide a soothing setting that clients need to decompress following intensive trauma treatment provided at the Heal clinical building, which is off-site.  This serene setting with access to horses is ideal for people in recovery.

37.     Beginning in August or early September 2019, the Jupiter Farms residents' association began complaining about the Ranch to high-level County officials.

38.     On October 29, 2019, Plaintiffs sent a reasonable accommodation request to the County to allow up to 19 unrelated residents to reside in the dwellings.[3] Plaintiffs have since agreed

---

[3] On November 19, 2019, Plaintiffs sent an amendment to their reasonable accommodation request, stating:

to reduce the maximum number of residents to 16.

39.    On November 13, 2019, the County's lawyer for code enforcement requested a meeting with Plaintiffs, and Plaintiffs made themselves available on Monday, November 18, 2019.

40.    However, on November 15, 2019, immediately after Plaintiffs agreed to make themselves available to meet with the County but before the meeting could take place, the Building Director/Building Official ("Building Director") wrote to Plaintiffs and Plaintiffs' counsel, stating that, notwithstanding Plaintiffs' request for reasonable accommodation, the proposed use of the property required a change of occupancy form and that "significant life safety enhancements" would be required by the Building Code.  The letter gave a ten-day notice to reduce the number of residents to five or fewer.

41.    Four representatives of Plaintiffs attended the November 18 meeting. Eleven County officials were present, including representatives from Planning, Zoning & Building, code enforcement, fire and legal.

42.    Counsel for Plaintiffs stated that Plaintiffs were seeking to be treated as a single family for all purposes; the County appears to take the position that the FHA and ADA simply do not apply to fire and building services.

---

In the October 29th request, I stated that "[t]here are two dwellings on the five-acre property."  I based that statement on an aerial photograph of the property which depicted two dwellings. Since then, I visited the property and attended a meeting with various County officials. I learned that there is a covered breezeway connecting the structures which, according to one interpretation of the ULDC, makes the structure one dwelling. Accordingly, please treat the connected structures as one dwelling for zoning purposes only.

Exhibit 2.

43.     The County's zoning definition of family is outdated and set forth in its Unified Land Development Code (the "ULDC").  According to the ULDC, a family can include an unlimited number of people living together so long as those people are related by blood, marriage, or adoption.[4]

44.     Florida Fire Prevention Code, including the Florida editions of NFPA 1 Fire Code and NFPA 101 Life Safety Code, does not define "family," but defines one- and two-family dwellings as dwellings "occupied by members of a single family with not more than three outsiders, if any, accommodated in rented rooms" from any automatic sprinkler and alarm requirements.  Life Safety Code § 24.1.1.2 (Nat'l Fire Prot. Ass'n 2018).  *See also*, *Id.* §6.1.8.1.1 (Classification of Occupancy defining One- and Two-Family Dwelling Unit, same).

45.     According to the Life Safety Code §24.1.1.2 and §6.1.8.1.1., a single family can include an unlimited number of people living together so long as those people are related by blood, marriage, or adoption plus "three outsiders."

46.     The County appears to claim that Plaintiffs' residents are not a "single family" effectively exempt from any automatic sprinkler and alarm requirements because they are not related by blood, marriage, or adoption and include more than "three outsiders." Instead, the County appears to claim that Plaintiffs' residents are a "Residential Board and Care Occupancy."

---

[4] ULDC Section 1.I.2.F.2 (definition of "Family").  Family – either a single person occupying a dwelling unit and maintaining a household, including not more than one boarder, roomer, or lodger as herein described; or two or more persons related by blood, marriage, or adoption occupying a dwelling, living together and maintaining a common household, including not more than one such boarder, roomer, or lodger; or not more than four unrelated persons occupying a dwelling, living together and maintaining a non-profit housekeeping unit as distinguished from a group occupying a boarding or lodging house, hotel, club or similar dwelling for group use. A common household shall be deemed to exist if all members thereof have access to all parts of the dwelling.

47.     The "Classification of Occupancy" section of the code defines "Residential Board and Care Occupancy" as

> An occupancy used for lodging and boarding of four or more residents not related by blood or marriage to the owners or operators, for the purpose of providing personal care services.

*Id*. at §6.1.9.1 "Small" Board and Care Occupancy dwellings, with sleeping accommodations for not more than 16 residents" are required to be "protected throughout by an approved automatic sprinkler system, installed in accordance with 32.2.3.5.3, using quick response or residential sprinklers." Id. at §32.2.3.5.1.[5]   Subsequent sections of the Code detail numerous additional requirements for the sprinkler systems including NFPA 13[6] requirements, adequacy of water supply, electrical supervision, monthly inspection of control valves.   See §§32.2.3.5.3 – 32.2.3.5.8.15.

48.     Section 1.1.1 of the local Palm Beach County amendments to the Florida Fire Prevention Code, exempts "detached one (1) and two (2) family dwellings" from numerous requirements, including §1.1.1.6 governing "Design, installation, alteration, modification, construction, maintenance, repairs, servicing, and testing of fire protection systems and equipment." However, as in the Florida Fire Prevention Code, as adopted by the County, "family" is not defined.

49.     Plaintiffs' residents are provided supervision, but are not provided any personal care services. They do their own shopping, cooking and laundry. They are supervised no more

---

[5] If a structure has been converted into a Board and Care Occupancy dwelling, rather than being housed in new construction, *and* is "serving eight or fewer residents when all occupants have the ability as a group to move reliably to a point of safety within 3 minutes," the dwelling is exempted from the sprinkler requirement.  Id. at §32.2.3.5.2.
[6] NFPA 13 Standard for the Installation of Sprinkler Systems, 2019 Edition.  The seven-page table of contents may be viewed free online.  The entire document may be purchased from the American National Standards store for $113.

than any family is. They are all ambulatory, and can respond as well or better than a traditional family can to a fire emergency. Residents of the Ranch are all adults and, by definition, sober 24 hours a day.  The County's building code also apparently does not define "family" but incorporates the provisions of the Florida Fire Prevention Code and the Life Safety Code. Fla. Stat. Ann. §553.73(1)(c).[7]

50.     The County's 2017 local amendments to the Florida Building Code except "[d]etached one- and two-family dwellings and multiple single-family *dwellings* (town houses) not more than three stories" from many provisions of the code, including "use and occupancy" provisions. Such dwellings "shall comply with the *Florida Building Code, Residential."* Palm Beach County Amendments to the Florida Building Code, 6th Edition (2017) at §101.2 (1)**.** [8]

51.     One-family and two-family detached residential dwelling units are also exempted from "plan review by the local fire official as described in this section or inspection by the local fire official as described in s. 633.216, unless expressly made subject to the plan review or inspection by local ordinance."  Fla. Stat. Ann. §553.79 (13)

52.     Moreover, one- and two-family dwellings "may use smoke alarms powered by 10-year nonremovable, nonreplaceable batteries in lieu of retrofitting such dwelling with smoke alarms powered by the dwelling's electrical system." Fla. Stat. §553.888.

---

[7] The Florida Fire Prevention Code and the Life Safety Code shall be referenced in the Florida Building Code, but shall be adopted, modified, revised, or amended, interpreted, and maintained by the Department of Financial Services by rule adopted pursuant to ss. 120.536(1) and 120.54. The Florida Building Commission may not adopt a fire prevention or life safety code, and nothing in the Florida Building Code shall affect the statutory powers, duties, and responsibilities of any fire official or the Department of Financial Services.

[8] In addition, [a]t its own option, each enforcement district or local enforcement agency may adopt rules granting to the owner of a single-family residence one or more exemptions from the Florida Building Code" with respect to certain additions, alteration and repairs.  Fla. Stat. Ann. § 553.80

53.     Even though the Ranch is clearly a one- or two-family dwelling, the Building Director stated that "significant life safety enhancements" were required at the property before more than five persons could reside there, based, apparently, on the fact that the residents of the Ranch are not related by blood, marriage or adoption.   When pressed to articulate those requirements, the Building Director identified four requirements with which Plaintiffs must comply: (1) a change of occupancy filing, (2) reduce the census to 16 or under; (3) a fire alarm system, and (4) a residential grade sprinkler system, installed in accordance with Section 903.2.8 of the Florida Building Code.

54.     The Building Director explained that any time the occupancy of a residence rose to between five and sixteen people unrelated to each other, such a residence would be classified as a Residential Group R-4 and the sprinkler system would be required. The Building Director confirmed, however, that the sprinkler system requirement does not apply when a family of five related by blood, marriage, or adoption brings relatives or newborn children into the dwelling to reside.

55.     The County's building official stated that there is no reasonable accommodation procedure under the Building Code.

56.     The Fire Marshalls in attendance stated that there is no reasonable accommodation procedure under the fire code.

57.     The County's building official also stated that if Plaintiffs disagreed with the requirement, Plaintiffs could appeal or request a variance from the Construction Board of Adjustment and Appeals.   However, the County's building official stated that such an appeal would require a showing of a "unique special circumstance" and remarked that he "did not see that happening."

58.     The County's building official offered no alternative to his ultimatum:  Plaintiffs must either reduce the number of residents at the Ranch to five or fewer, or he would "red tag" the property and shut off the electricity on Monday, November 25th.

59.     Neither the apparently futile appeal process nor the sprinkler installation could possibly be completed before the threatened red-tagging and electricity-shutoff on Monday, November 25, 2019.

60.     Also, at the November 18th meeting, the County's Executive Director of Planning, Zoning & Building acknowledged that the County had begun investigating Plaintiffs after community pressure from neighboring property owners, and stated, "that's how it happens."

61.     The County's code enforcement staff has previously stated that its code enforcement efforts at this and nearby locations were triggered by neighbor complaints, which are motivated in large part by prejudice based on the disabilities of the residents. This is, in part, due to the rural nature of the surrounding properties where activity on the properties are not visible to passersby on the roads

62.     In addition, the administrative assistant to the local County Commissioner has sent hundreds of emails to County staff to prevent housing and treatment providers from operating.

63.     The County has a history of discrimination against people in recovery and their housing and Health care providers. For example, approximately 10 years ago, the County Commission refused approvals to the Caron Foundation, a nationally respected non-for-profit substance use disorder treatment provider, because:

> (a) That there are too many drug and alcohol treatment facilities in Palm Beach County, particularly Delray Beach, and those facilities, particularly Caron Foundation, were now moving into Boca Raton;
> (b) That drug and alcohol treatment facilities, primarily the Caron Foundation, attract many people from outside of Palm Beach County, including out-of-state and foreign countries.

The Commission also stated that the presence of the facilities created law enforcement problems with patients who leave or are removed from treatment before they are "cured," but remain in the county, on county streets, with a continuing addiction which leads to criminal activity.  "I want to be known for quality care," Former Commissioner Mary McCarty said. "But I don't want to be known as the drug rehab capital of the world," saying Commissioners should "send a message" with the denial that they wanted to avoid expansion of treatment facilities. Commissioner McCarty told Commissioners that the county attorney advised the Commission had complete, total and utter discretion in this matter.

64.     Commissioner McCarty also expressed frustration with the fact that because of litigation by the United States Department of Justice and others against the City of Boca Raton (in which the United States listed Caron as an aggrieved party), the County could not further restrict Caron and other drug and alcohol treatment facilities, group homes for persons in recovery in County neighborhoods:

> "[A]nd now it has gone into Boca. They have gone and sued and they've been exempted from zoning ordinances.  Boca wanted to put them in medical areas, and they lost that lawsuit.  They don't have to follow the zoning ordinances.  They can be in the middle of any residential community."

65.     Commissioner McCarty requested that the Commission "send a message" that "yes, you can come here, you've made sure with your expensive lobbyists in Washington and in Tallahassee that you can do whatever you want.  But if you're going to come, we're not going to give you an incentive to come, because we need to take care of the people we have here."

66.     Most of the Commission adopted as its basis for denial the Delray Beach Mayor's statement that:

> "The expansion of this program or any other programs is going to provide such a disparaging effect on our ability to provide public safety.  Once someone -- and

14

their own statistics will tell you that three to five of these people seeking treatment relapse three to five times.  And some of them never make it. And while they have relapsed, they have two choices of action:  One of them is to enter the criminal justice system because they will steal, rob or do whatever is necessary to obtain the money that they need to get their drug of choice, or they will sell their bodies to obtain money to get their drug of choice."

67.     Then-Commissioner Mary McCarty urged denial because the County did not want to encourage Caron or others to expand or continue its treatment facilities: "I would make a motion that we deny this request and we wish them well in their endeavors.  But that we are not going to encourage them."

68.     This pattern of discriminatory intent continues and is reflected in the actions of the County with respect to the Ranch.

### Overview of Recovery, and Heal's Program

69.     Substance use disorder is a disease that has a physiological and psychological component. The consequences of substance use disorders are vast and varied and affect people of all ages and backgrounds. When people enter treatment, the disorder has often taken over their lives.  It has disrupted how they function in their family lives, at work, and in the community, and has made them more likely to suffer from other serious illnesses.  Most individuals seeking treatment are eager for help and require both medical and emotional support services.

70.     Fortunately, there is abundant evidence that treatment works, and there are many different methods to treat persons with alcohol and other substance use disorders. To be successful, treatment must address the needs of the whole person.  The goal is to provide the best possible outcome for the patient.

71.     Heal follows the well-established model having individuals new in recovery living together with others who are abstaining from drugs and alcohol, including by sharing a bedroom. This environment limits isolation and provides continuous assistance to identify, confront and/or

resolve problems and issues, before they can lead to a possible relapse.

72.     Heal specializes in residential treatment for adult males and females.

73.     All residents at Heal will be admitted and discharged by a medical doctor.  At the time of admission, residents are given a handbook, which provides a schedule for medications, group discussion times, individual therapy and meals, as well as Heal's rules and regulations. Residents are also subject to no-notice drug testing.  They are also given a biopsychosocial assessment by a counselor.

74.     Heal is not a receiving facility for acute residents mandated to treatment. Heal's housing is provided in a private residential setting with home-like amenities.  Most residents will eventually return to their homes and jobs and continue with outpatient services.

75.     The Ranch is a secure, self-contained residential center. To protect the privacy and safety of the residents, entry into the Ranch is limited for those other than staff, residents, and necessary vendors.  Staff visually checks and documents the location of all residents admitted into Heal every 15 minutes within the first 24 hours of admission, every 30 minutes through the remainder of their detox and, once they have stepped down from detox, they are visually checked and documented four times during each eight-hour shift for a total of 12 times per day.

**Effect of Eviction on Heal Residents**

76.     Most if not all of Heal's patients' substance use disorders stem from trauma to some degree. As is common with substance use disorder recovery, Heal's patients participate in trauma therapy at the offsite treatment location.

77.     The Heal residents are recovering at the Ranch primarily because it is the most tranquil, serene environment to decompress from the trauma therapy that they receive from the Heal Behavioral Health treatment facility in West Palm Beach.

78.     Unpredictability and chaos are some of the trademarks that a trauma victim has been exposed to in their lives.

79.     People come to treatment to learn to cope and heal from these past traumatic issues, and they work on them in a clinical setting at Heal.

80.     To abruptly displace and evict these individuals from their home is not only not recommended, it could actually be detrimental to their health, and most definitely would impede negatively on their progress made thus far.

81.     Halting treatment and disrupting lives when people have finally sought help and developed a level of trust with their caregivers would cause tremendous personal setbacks to these individuals.

82.     When the boundaries of someone in therapeutic trauma treatment are violated, it very likely could have lasting, if not permanent negative effects.

83.     The damage caused by suddenly "uprooting" these individuals from their current home is immeasurable.

### Community and Official Hostility to People in Recovery

84.     To restrict those in recovery from substance use disorders from its County limits, the County has treated Plaintiffs disparately based on hostile community reaction.

85.     Hostile community comments have been directed against Heal and prospective residents.

86.     The County's treatment of housing for people in recovery from substance use disorder, even if could be construed as neutral on its face and in motive and intent, has a disparate impact on Heal and its residents in violation of the ADA and FHA.

### Remedies

87.     Because of the County's discriminatory zoning scheme, Plaintiffs' have suffered,

and continues to suffer, damages in lost or delayed profits, loss of civil rights, lost opportunity, frustration of mission, diminution of market share, and other damages as a direct result of the County's conduct.

88.     Plaintiffs have attempted to resolve this matter amicably but to no avail.  Plaintiffs have been told by the building and fire officials that there are no reasonable accommodations available and any other administrative remedies would be futile.  The County rejected Plaintiffs' offer to reduce the census to 16, apply for permits to install fire sprinkler and fire alarm monitoring system, and apply for a change of occupancy.

89.     Loss of housing services is direct and imminent because of the County's facially discriminatory zoning scheme. Plaintiffs, and their disabled residents, will suffer irreparable injury if this Court does not issue a preliminary and permanent injunction.  The loss of rights protected by the ADA and FHA is so serious that, as a matter of law, irreparable injury is presumed. Plaintiffs have no adequate remedy at law.

90.     There is an actual, bona fide and justiciable controversy existing between Plaintiffs and the County as to whether the County's imposition of far more stringent land use requirements substance use disorder residents and providers than it imposes upon county residents related by blood, marriage or adoption violates the ADA and FHA.

91.     The County is intentionally treating Plaintiffs and their residents in a discriminatory fashion and is imposing far more stringent land use requirements on Plaintiffs and their residents than it imposes upon county residents related by blood, marriage or adoption who are not suffering from substance use disorders.

92.     Singling out substance use disorder treatment facilities and their residents for different treatment violates the Americans with Disabilities Act and the Fair Housing Act.

18

Plaintiffs seek temporary and permanent injunctive relief, damages, and attorneys' fees to remedy those violations.

93.     Plaintiffs have hired the undersigned and agreed to pay them reasonable attorneys' fees.

### The ADA and FHA

94.     The FHA and ADA prohibitions against discrimination based on disability may proceed under three related theories of liability: (1) disparate treatment, also called intentional discrimination; (2) disparate impact, also called discriminatory effect; and (3) failure to reasonably accommodate.

95.     The County states that it has no reasonable accommodation procedure for its fire or building codes, and claims it is merely enforcing state law which contains no such procedure either code. Further, the County claims that people with disabilities can, with respect to the Building Code appeal the decision.  This standard for appeal is inconsistent with the standard for a reasonable accommodation which is merely to show that the request is reasonable on its face and necessary. Any requirement by the County above and beyond that threshold showing is unduly burdensome and violative of the ADA and FHA.

96.     Under the FHA and ADA, zoning, fire and building ordinances that apply only to unrelated individuals with disabilities are facially discriminatory. Thus, it is unlawful for a local government to treat a group of recovering substance abusers differently from a group of five or more persons related by blood, marriage or adoption living together, or other non-disabled group of more than five unrelated persons living together.

97.     The ADA and FHA both prohibit retaliation for or interference with the exercise of for activity protected by the acts. 42 U.S.C. § 12203 and 28 C.F.R. § 35.134; 42 U.S.C. §3617 and

24 CFR §100.400.

*ADA*:

98.     Congress's stated broad goal in enacting the ADA was to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1). The ADA requires that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.  42 U.S.C. § 12132. Section 12132 constitutes a general prohibition against discrimination based on disability by public entities.

99.     Zoning is an activity covered under Title II of the ADA.  In the preamble to the regulations implementing 42 U.S.C. § 12132, the Department of Justice notes that "[T]itle II applies to anything a public entity does," 28 C.F.R. pt. 35, app. A at 438 (1998), and, in the Technical Assistance Manual compiled to interpret the ADA, expressly uses zoning as an example of a public entity's obligation to avoid discrimination. The federal regulations implementing the ADA prohibit a public entity from discriminating against a qualified individual with a disability by administering a licensing program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability.

100.    A public entity is further prohibited from establishing requirements for the programs or activities of licensees that subject qualified individuals with disabilities to discrimination on the basis of disability.  35 C.F.R. § 35.130(6).

101.    The federal regulations also make it unlawful for a public entity to make determinations about the site or location of a Ranch where such determinations have the purpose or effect of excluding individuals with disabilities from, denying them the benefits of, or otherwise

subjecting them to, discrimination with respect to those facilities. 35 C.F.R. § 35.130(4)(i).

*FHA*:

102.    In 1988, Congress amended the FHA, 42 U.S.C. § 3601 *et seq*., to extend the guarantee of fair housing to handicapped individuals.  Congress also authorized the Secretary of the United States Department of Housing and Urban Development to promulgate regulations to implement the FHA.  42 U.S.C. § 3614a.

103.    Under the FHA, the term "handicap" means, with respect to a person, a "physical or mental impairment which substantially limits one or more of such person's major life activities, a record of such an impairment, or being regarded as having such an impairment."  42 U.S.C. § 3602(h).  The term "physical or mental impairment" includes "alcoholism" and "drug addiction (other than addiction caused by current, illegal use of a controlled substance)."  24 C.F.R. § 100.201.

104.    Under the FHA, it is unlawful to discriminate against or otherwise make unavailable or deny a dwelling to any buyer or renter because of a handicap of that buyer, renter, or person residing in or intending to reside in that dwelling after it is sold, rented, or made available. 42 U.S.C. § 3604(f)(1).

105.    The FHA further provides that it is unlawful to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of the handicap of that person or persons residing in or intending to reside in that dwelling after it is sold, rented, or made available. 42 U.S.C. § 3604(f)(2).

106.    The federal regulations implementing the FHA specifically prohibit, as a discriminatory activity, providing municipal services differently because of handicap.  24 C.F.R.

§ 100.70(d)(4).

107.     The federal regulations further make it unlawful, because of handicap, "to restrict or attempt to restrict the choices of a person by word or conduct in connection with seeking, negotiating for, buying or renting a dwelling so as to . . . discourage or obstruct choices in a community, neighborhood or development."  24 C.F.R. § 100.70(a).

### Count I - Claims under the ADA against the County

108.     Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 102 above as though fully set out herein. Heal's prospective residents are qualified individuals with disabilities within the meaning of 42 U.S.C. § 12101.

109.     The County is a qualifying public entity within the meaning of the ADA.  42 U.S.C. § 12131(1) (A) (1999).

110.     The County's application of its zoning code to prevent use of Heal by Plaintiffs' residents constitutes discrimination under Title II of the ADA.

111.     These acts were taken with the intent to discriminate against, and had the effect of discriminating against, persons in recovery and those who provide services to them, namely Plaintiffs and its prospective residents.

112.     As a result of the County's discriminatory reaction to the Plaintiffs' use and the illegal behavior that resulted from that reaction, Plaintiffs have expended time and financial resources and has lost the opportunity to conduct their business and provide much-needed treatment.

### Count II– Claims under the FHA against the County

113.     Plaintiff incorporates by reference paragraphs 1 through 98 and 103 through 108 above as though fully set out herein.

114.    The Ranch is a "dwelling" within the meaning of the FHA.

115.    The County's application of the zoning code constitutes discrimination under the FHA.

116.    The County has effectively made housing unavailable to prospective Heal residents.

117.    These acts were undertaken with the intent to discriminate against, and had the effect of discriminating against, persons in recovery and those who provide services to them, namely Plaintiffs and their prospective residents.

118.    As a result of the County's discriminatory reaction to Heal's use, Plaintiffs have expended time and financial resources and has lost the opportunity to conduct their business and provide a much-needed service.

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare that the County zoning, fire and building code provisions that treat residents undergoing substance use disorder treatment differently from other single-family units violates the ADA and FHA;

B.    Order the County to allow Plaintiffs' land use without the discriminatory burdens and restrictions;

C.    Enjoin the County from further retaliation against Plaintiffs for exercising rights protected by the ADA and FHA;

D.    Award damages for lost or delayed profits, lost opportunity, frustration of mission, diminution of market share, and any other damages; and,

E.    Award costs and reasonable attorneys' fees.

/s/ James K. Green
James K. Green, Esq.
Florida Bar No. 229466
Nancy A. Udell, Esq.
Florida Bar No: 125478
**James K. Green, P.A.**
Esperanté, Suite 1650
222 Lakeview Ave.
West Palm Beach, FL  33401
Tel:  561-659-2029
Fax:  561-655-1357
jkg@jameskgreenlaw.com

**Counsel for Plaintiffs**

24